## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

**IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928**

**This Document Relates To:**

**SUMMERLIN v. BAYER CORPORATION, ET AL.,
Case No. 9:08-cv-80903**



FILED by _____ D.C.

DEC 3 0 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

### PLAINTIFF MELVIN E. SUMMERLIN'S RESPONSE TO
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Melvin E. Summerlin, ("Plaintiff") respectfully requests denial of Defendants' motion for summary judgment. Plaintiff can sustain his wrongful death claims (on theories of negligence and product liability) because the claims were fraudulently concealed by the Defendants and were brought timely after discovery of the claim. Plaintiff's breach of warranty claims are clearly viable causes of action under Alabama law. Finally, Plaintiff's claims for either fraudulent concealment and/or fraudulent suppression survive summary judgment because the Plaintiff and Plaintiff's decedent relied upon the truth of the information provided regarding his wife's heart surgery, including risks of surgery and medications including Trasylol to be given, and did so to their detriment. For the reasons set forth below, the Defendants' Motion necessarily fails.

### COUNTERSTATEMENT OF FACTS

This proceeding centers around a prescription medication aprotinin, trade name Trasylol® *See* Exhibit 1, First Amended Complaint, ¶9-18. The United States Food and Drug Administration (the "FDA") approved Trasylol for use in certain open-heart

surgeries in 1993, and for all coronary artery bypass graft surgeries in 1998. Id. The drug is intended to prevent peri-operative blood loss during surgery and reduce the need for blood transfusions. Id.

On or about March 16, 2006, Frances Summerlin had open heart surgery at Brookwood Medical Center, Birmingham, Alabama, during which time she received Trasylol. Following the administration of Trasylol during her surgery, Mrs. Summerlin suffered from acute renal failure and ultimately died on March 26, 2006. On May 15, 2006, Dr. Ronson, her cardiothoracic surgeon who performed the surgery on March 16, 2006, completed her Death Certificate, referencing a cause of death of myocardial infarction See Exhibit 2, Death Certificate, although testified that he was not aware of the exact cause of Mrs. Summerlin's death at the time.

Prior to her heart surgery, Mrs. Summerlin discussed the risks and benefits of her surgery with her surgeon, Dr. Ronson. See Exhibit 3, Deposition Testimony of Russell Ronson, p. 57:19-59:2 (May 11, 2009). Plaintiff testified that he was involved in all of his wife's medical care and decision making and discussed the risks and benefits with his wife after discussing the same with Dr. Ronson. See Exhibit 4, Deposition of Melvin Summerlin, p. 54:17-55:17, 130:14-132:6 (May 8, 2009). Plaintiff and Plaintiff's decedent relied upon the information provided to them by Dr. Ronson to make an informed decision regarding the surgery to be performed. See Exhibit 4, Deposition of Melvin Summerlin, p. 54:17-55:17, 130:14-132:6, 150:14-153:25, 156, and 157 (May 8, 2009); see also Exhibit 5, Consents for Treatment.[1]

---

[1] Plaintiff testified that it was Mrs. Summerlin's signature on the Consent forms and further that she read the consents prior to signing. See Exhibit 4, Deposition of Melvin Summerlin, p. 150:14-153:25.

2

353202

Dr. Ronson testified he selects medications to be utilized during surgery where the benefits of the medications outweigh the risks known to be associated with them. *See* Exhibit 3, Deposition of Russell Ronson, p. 16:9-17:10. Dr. Ronson further testified that he learns of the risks associated with a particular drug from the package insert for the medication as well as conferences. *Id.*, p. 18:8-18. Dr. Ronson further testified that he discussed the risks and benefits of heart surgery with Mrs. Summerlin. *Id.*, p. 58:19-60:13. He specifically considered the known and disclosed risks associated with Trasylol before using it in the surgery performed on Mrs. Summlerin. *Id.*, p. 73:9-15.

However, Dr. Ronson testified that after reading publications disclosing significant risks associated with Trasylol, which were published *after* Plaintiff's decedent's surgery, he ceased use of the drug. *Id.*, p. 107:10-109:23. In fact, Dr. Ronson stated that both prior to and following the publications regarding significant risks associated with Trasylol which were revealed in these publications, Bayer advised of the benefits of Trasylol, including the anti-inflammatory properties of the drug. *Id.*, p. 112:19-115:24. However, Dr. Ronson could not recall any representative of Bayer ever disclosing or discussing with him the significant risks of renal failure and/or death to him. *Id.*, p. 130:1-14.

Following the surgery, Mrs. Summerlin experienced acute renal failure. Dr. Ronson advised Plaintiff that he didn't know what was causing the kidneys to act like they were, which he believed was unusual. *See* Exhibit 4, Deposition of Melvin Summerlin, p. 124:9-127:3. It was not until April 24, 2008, that Plaintiff became aware that his wife had received Trasylol during her surgery performed on March 16, 2006. *See* Exhibit 6, Plaintiff's Fact Sheet, p. 11; *see also*, Deposition of Melvin Summerlin, p.

3

178. After learning of the use of Trasylol during his wife's heart surgery, he learned that it was used during the surgery to control bleeding, but he contends it did the opposite and caused harm to his wife's kidneys and her subsequent death. *Id.*, p. 180. Promptly thereafter, he filed the instant action on May 12, 2008.

Bayer's motion focuses almost exclusively on the inability of Summerlin to rely on Bayer's concealment of the i3 study it commissioned in response to Dr. Mangano's NEJM publication in support of Plaintiff's fraud and fraudulent concealment claims. This assertion belies the simple fact that the concealment of the preliminary results of the i3 study is just one in a long and tragic series of events where Bayer affirmatively withheld pertinent data critical of its drug Trasylol. Indeed, Bayer fraudulently concealed studies from physicians, patients and the general public with reckless disregard for the public health and welfare in order to maximize Bayer's profits for the vast majority of a decade. This intentional concealment of adverse information regarding Trasylol was intended by Bayer to conceal the dangers of its drug, including acute kidney injury, cardiac complications and even death. More specifically, set out below are just a few examples of Bayer's efforts to conceal the dangers of Trasylol dating back to the turn of the century.

### Dr. Kress

In March of 2000, Bayer made medical-science liaison presentations in Milwaukee to "organize[] all of the new publication data in an understandable and interesting format" to encourage physicians to use Trasylol.[2]   As part of these presentations, Bayer met with Dr. David Kress at St. Luke's Medical Center, where

---

[2] *See* Exhibit 7, BAY04627747-8. All documents referenced as BAYCS, or BHCA, are collectively referred to as Exhibit 7. The documents are separated by blank pages and in the order referenced in the response.

4

Bayer encouraged Dr. Kress to use Trasylol at his hospital and discussed performing a retrospective study.[3]

By December 31, 2002, Bayer had to decide whether the full dose atrial fibrillation study should be completed by Dr. Kress or Hartford Hospital.[4]   Bayer determined that Dr. Kress could perform the study with less bias and on a smaller budget compared to Hartford Hospital.[5]  Bayer then awarded a $48,000.00 grant to Dr. Kress to perform his Trasylol study.[6]

In 2003, after the preliminary analysis, Dr. Kress determined that his study was completed and did not need further work since he already had an answer to his proposal question.[7]  Dr. Kress determined from the preliminary analysis that there was a "renal failure concern with Aprotinin [Trasylol]" at doses higher than half dose."[8]  He made Bayer aware of these preliminary findings.[9]  Bayer continued to work with Dr. Kress and had Dr. Kress draft a "report" of his protocol and analysis, which documented a 3.1 times higher risk of renal failure when using a higher than full dose Trasylol.[10] Bayer was so disheartened with Dr. Kress' study that they were concerned about his

---

[3] Exhibit 7, BAY04713531.   After this meeting, Bayer was eager to meet with Dr. Kress to decide on a Trasylol study project. Exhibit 7, BAYCS00780681-2. Dr. Kress suggested a study into the lower doses of Trasylol, but Bayer rejected that proposal and recommended a study on high doses. *Id.*

[4] Exhibit 7, BAY05025291.

[5] *Id.*

[6] *Id.*

[7] Exhibit 7, BAY05253843-9.

[8] *Id.*

[9] Bayer determined that they needed to convince Dr. Kress otherwise or possibly turn this project over to another physician, Dr. Frank Downey. Exhibit 7, BAY05253843-9. In addition, Bayer considered changing the protocol to address this causal connection. *Id.*

[10] Exhibit 7, BAY05426839-46. Although this protocol "report" underwent at least seven revisions, Bayer was still not pleased with the document as Bayer did not seek publication. *Id.* Bayer ultimately determined that Dr. Kress would not surrender his values for Bayer's atrial fibrillation study results, as he would not make recommended changes, so Bayer made the conscious decision to give up writing this article. Exhibit 7, BAY04627747-8.

5

influence over other surgeons and voiced specific opinions that his "report" should not be published.[11]  Upon seeing Dr. Kress' report, one Bayer executive stated:

> Ee gads, is tis (sic) headed for publication.? (sic)  OR is this s (sic) a dead issue.  Do we want to continue to add gas to this fire?????[12]

On the following day, Mr. Pascale sent another email in response to a question—"Could you let me know if you we should pursue additional information from this site [Dr. Kress]." His response:

> . . . if Kress has not mentioned this, neither should we.  Let this go.  If you have any question on how to proceed (in this case not) call me.[13]

Thus, in 2003, after receipt of Dr. Kress' results, and despite Bayer's knowledge of Trasylol's relationship to renal failure, Bayer made the conscious decision to not publish Dr. Kress' study, not release the results of this study, and to hide this health and safety information from physicians, patients and the general public.  This was years before Summerlin's surgery.   It was not until November 9, 2006, months after Summerlin's surgery, that Bayer finally informed the FDA about the renal safety findings of Dr. Kress.[14]

## St. George's Hospital London

Bayer's fraudulent concealment of adverse studies, however, was not limited to that of Dr. Kress and its own i3 study.  In October 2001, Bayer approved a protocol for St. George's Hospital London to study the benefits of using Trasylol.[15]  By November 2003, Bayer learned from this study that Trasylol did not save patients from receiving

---

[11] Exhibit 7, BAY04691537-8; Exhibit 7, BAY 05322498-9.

[12] Exhibit 7, BAY05322498.

[13] Exhibit 7, BAY05322480-81 (emphasis added).

[14] *See* Exhibit 8 (Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission), p.81.

[15] Exhibit 7, BAY04213410-17.  This protocol deliverable, or the purpose of this protocol, was to have a paper be published regarding the results.  *Id.*  Any papers published on the subject were copyright protected by Bayer, while the copyright to the database was property of Richardson Research. *Id.*

transfusions as non-Trasylol treated patients received less blood.[16]  As a result of this study, Richardson Research's prepared a report on St. George's Hospital London for Bayer analyzing the data and unexpected outcomes.[17]  The study stated that "the use of aprotinin appeared to be associated with longer stays, with increased use of blood products and higher mortality."[18]  In light of this study's negative findings, Bayer's Kemal Malik wrote to two other Bayer employees inquiring "What is the recommendation in terms of informing authorities about this?"[19]   Bayer never did report this to the authorities.  In fact, Bayer admitted during the course of discovery that this "report entitled 'An Investigation Into The Effect of Aprotinin On Usage of Blood Products And Lengths Of Stay At St George's Hospital London' dated December 11, 2003, years before Summerlin's surgery, was not provided to the FDA by the Responding Defendants prior to September 21, 2006,"[20] at a point after Summerlin's surgery.

Once again in the 2003 time period, Bayer made a conscious decision to conceal adverse information it learned from the St. George's Hospital London study from physicians, patients and the general public.  Bayer affirmatively decided withhold from prescribers, and their patients, including Summerlin and Summerlin's physicians, that

---

[16] Exhibit 7, BAY04213426.  Bayer attempted to explain this unexpected outcome by indicating that Trasylol was mainly used in special patient groups.

[17] Exhibit 9, BHCAG01306584-BHCAG01306637.  Bayer received the Richardson research report, which was revised by the global project team and the UK medical department.  Exhibit 7, BAY03446626-8.  *See also* Exhibit 7, BAY04213407-9.

[18] Exhibit 7, at BHCAG01306586.  In light of this adverse outcome, Bayer attempted to manipulate data and change the outcome.  Bayer attempted to use other studies to help bloster the argument that Trasylol reduces the transfusion rate.  Exhibit 7, BAY04213430.

[19] Exhibit 7, BHCAG01306581-2.

[20] Exhibit 9 (Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission), p.83.  Bayer also questioned whether to include this report in a list of Trasylol studies and decided since it was not a "prospective clinical trial data" study to not include this report.  Exhibit 7, BHCAG01306583; Exhibit 7, BAY03963323-4.

7

Trasylol was associated with longer hospital stays, more blood transfusions and a higher mortality rate.[21]

### Dr. Mangano and the New England Journal of Medicine (NEJM) Study

Although Bayer was able to subvert the results of the Kress and St. George's studies, independent medical investigators were studying Trasylol as well. Bayer learned of at least one such medical investigator's findings almost two years before the results were published. Instead of alerting the medical community, Bayer chose to sit on the information and prepare what, in the words of a key opinion leader named Dr. Royston, was a "powerful" preemptive rebuttal.[22] In fact, Dr. Royston went on to say the following on October 18, 2004:

> On a completely separate issue I am sure you know that Dennis Mangano has submitted a manuscript from McSPI showing that aprotinin use was associated with a 3-4 fold increase in the need for dialysis together with increased mortality and stroke. . . . Analysis of this database showed that aprotinin has significant safety concerns and my be dangerous for certain patients. The data I have seen will need a pretty powerful rebuttal. I am sure you will have one to hand when required.[23]

The corporate message from Bayer could not be any clearer: "Our salaries in the US are paid form (sic) Trasylol – so we need some more effort.[24] Moreover, from the outset Bayer consider Trasylol a "Cash Cow."[25] It comes as no surprise, then, that Bayer engaged in a decade-long fraud to conceal data and publications that were critical of the safety of Trasylol's profit margin.

---

[21] *See* Exhibit 9 (Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission), p.83.
[22] Exhibit 7, BAY04534165.
[23] *Id.*
[24] Exhibit 7, BHCAG01527307.
[25] Exhibit 7, BAY00742025.

8

The subject of Dr. Royston's missive, Dr. Dennis Mangano, studied the effects of Trasylol even before 2003. In fact, years before Dr. Mangano's January 2006 New England Journal of Medicine article was published demonstrating that Trasylol was associated with an increased risk of mortality, stroke, kidney failure and myocardial infarction, Bayer was aware of its existence, and the safety signal it conveyed, yet did nothing. In fact, a January 3, 2006 Sales Training Update stated, in response to Dr. Mangano's NEJM publication, that "Bayer has only just become aware of this observational study. . . . ."[26] This assertion sparked internal questions, with one Bayer employee wondering "I am somewhat confused by Bayer's statements that we just became aware of this article."[27] As was pointed out almost two months previously, in a brief moment of candor, a Bayer employee said this about Bayer's knowledge of Dr. Mangano's study: "Yes, we are aware of this pending publication by Dennis Mangano of McSPI, and have been anticipating it for a long time."[28]

In August 2003, Bayer's key opinion leader Linda Shore Lesserson reviewed Dr. Mangano's data, confirming a higher incidence of myocardial infarction and mortality associated with Trasylol as well as the fact that "the higher the dose, the greater the adverse events."[29] Bayer received further information about Dr. Mangano's Trasylol study via an October 2004 communication with another key opinion leader David Royston.[30] Dr. Royston informed Bayer in writing that Dr. Mangano's study showed

---

[26] Exhibit 7, BAY05634659-62.

[27] Exhibit 7, BAY03729284.

[28] Exhibit 7, BAY04563218.

[29] Exhibit 7, BAY05010545.

[30] Exhibit 7, BAY04534165.

353202

Trasylol with "significant safety concerns" due to a "3-4 fold increase in the need for dialysis together with increased mortality and stroke" rates.[31]

Instead of advising the physicians, intended recipients and general public of this negative study, Bayer decided to hire a detective and research Dr. Mangano to determine "why he was out to get" Bayer.[32]   Also, instead of advising the physicians, intended recipients and general public, Bayer prepared a press Standby Statement stating Bayer just became aware of the Dr. Mangano study in anticipation of Dr. Mangano's study being published in January 2006.[33]   This Standby Statement also argued that Trasylol was safe and effective, despite Bayer's knowledge from Linda Shore Lesserson validating Dr. Mangano's findings.[34]   Thus, once again, Bayer affirmatively decided to not inform physicians, patients and the general public of Trasylol's adverse effects and instead strategized against the Mangano study touting the effectiveness and safety of Trasylol.   All of the described events regarding the Mangano's Study occurred prior to Summerlin's surgery.

### Bayer's Global Database

The most egregious example of Bayer's fraudulent concealment of the adverse effects of Trasylol was only learned during this litigation.   In Bayer's response to Plaintiffs' Second Set of Interrogatories, Fifth Set of Request for Production of Documents and First Requests for Admission served July 21, 2009, Bayer admitted that by January 1, 2002, Bayer knew that there was a statistically significant relationship

---

[31] *Id.*

[32] Exhibit 7, BAY00686462-3. Bayer also prepared a historical review of Dr. Mangano documenting his training, education, family and providing that as far back as 2002 or 2003, Bayer knew of Dr. Mangano's anticipated January 2006 publication. Exhibit 7, BAY02463308-13.

[33] Exhibit 7, BAY05634659-62.

[34] Bayer's James Sadler complained in January 2006 that Bayer heard of Dr. Mangano's study for months before publication and therefore should have "been more prepared with pre-information or an immediate rebuttal to the article" before the January 26, 2006 correspondence. Exhibit 7, BAY03729284.

353202

between Trasylol and serum creatinine elevations greater than 0.5 mg/dL.[35]  Despite the fact that Bayer possessed this knowledge, they failed to change the package insert for years.  Bayer failed to advise physicians, patients and the general public that Trasylol causes a serum creatinine elevation greater than 0.5mg/dL in 2002, 2003, 2004 or 2005.  In fact, it was not until 2006 that Bayer changed Trasylol's package insert to advise physicians of the serum creatinine elevation, but couched this statistically significant relationship as the greater than 0.5mg/dL serum creatinine increase as being reversible and not harmful.[36]

## STANDARD OF REVIEW

Under Rule 10(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and dentifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the district court that the nonmoving party has failed to present evidence in support of some

---

[35] See Exhibit 10 (Responses and Objections of Defendants to Plaintiffs' Second Set of Interrogatories, Fifth Set of Requests for Production of Documents and First Requests for Admission), p. 70-2.  Coincidentally, in this same discovery, Bayer admits that it failed to analyze their global pool of placebo-controlled studies of patients undergoing CABG surgery until 2006. *Id.* at p. 64.
[36] See Exhibit 11 (Trasylol 2006 Package Insert).

element of its case on which it bears the ultimate burden of proof. *Id.* at 322-24, 106 S.Ct. 2548. Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. 2548. The evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If there are any issues of material fact, the court must deny summary judgment. Fed.R.Civ.P. 56(c).

## ARGUMENT

I.   **PLAINTIFF'S WRONGFUL DEATH CLAIMS ARE NOT BARRED BY THE LIMITATIONS PERIOD FOR BRINGING SUCH CLAIMS AS BOTH THE LIMITATIONS PERIOD IS EXTENDED BY THE DEFENDANTS' FRAUDULENT CONCEALMENT AND SUPPRESSION AND A FACTUAL QUESTION EXISTS AS TO WHETHER DEFENDANTS ARE ESTOPPED FROM ASSERTING A LIMITATIONS DEFENSE.**

The Defendants' argument regarding the limitations period under Alabama's wrongful death act, and its application to cases involving fraudulent concealment or suppression, is absurd. The Defendants' argument, in essence, is that if a tortfeasor is crafty, devious, or deceitful enough to withhold pertinent data regarding the dangers of drugs it puts on the market for a sufficient period of time, it can be relieved from any liability for causing death. The audacity of such an argument, especially in light of the fraudulent concealment and suppression of pertinent information regarding the dangers and risks of Trayslol, further serve to exemplify the callous disregard the Defendants have shown throughout its marketing, promotion and commercial sale of Trasylol. This

12

Court should not reward the Defendants' fraudulent conduct by dismissing this action on limitations grounds.

While the Defendants cite several cases on the time period by which a wrongful death action should be filed under Alabama law, none of the cases cited by Bayer give any guidance or indicia of how an Alabama Court may reconcile the concern that a drug company, whose product caused death, may be rewarded by concealing material information concerning the drug for a sufficient period of time, in an attempt to bar an otherwise meritorious wrongful death claim.  However, an examination of cases in Alabama certainly suggests that Alabama has not created an absolute bar to a wrongful death claim sufficient for summary judgment, where the Defendants' fraudulent conduct prevented the identification of that cause of action.

In *Johnson v. Brookwood Medical Center*, 946 So.2d 849 (2006), the Supreme Court of Alabama analyzed a dismissal of a wrongful death action under Alabama's Wrongful Death Statute, § 6-5-410(d).  At that time, the *Johnson* court had the opportunity to squarely decide whether a claim of fraudulent concealment or suppression of a wrongful death claim would nonetheless be subsumed by the two year limitations period set forth by § 6-5-410(d).  However, the Alabama Supreme Court did not, as a matter of law, find that irrespective of a claim for fraudulent concealment or suppression, it would nonetheless bar a wrongful death claim based on the two year limitations period found in § 6-5-410(d).

In *Johnson*, the trial court dismissed a cause of action based upon the two year limitations period set forth under Alabama's wrongful death statute.  On appeal, the appellant argued that the defendant had fraudulently concealed or suppressed

13

information upon which it could have discovered the wrongful death claim. Instead of holding that the two year limitations period under the wrongful death act would nonetheless bar a claim, even where fraudulent concealment of suppression was asserted, the *Johnson* court failed to do so. Instead, the Alabama Supreme Court went into a lengthy discussion of the fact that the appellant had, for the first time on appeal, raised allegations that the defendants had fraudulently concealed or suppressed information, which would have allowed the plaintiff from discovering the wrongful death claim. Id. The efforts made by the Alabama Supreme Court to avoid holding there was an absolute bar to a wrongful death claim even where fraudulent concealment is alleged, is a clear indication that under the appropriate and timely assertion of fraudulent concealment claim, the Alabama Supreme Court would have taken a different analysis.

Before *Johnson*, the Alabama Supreme Court had earlier had the opportunity to determine that the limitations period set forth under § 6-5-410(d) for bringing a wrongful death action would be unaffected by claims of fraudulent concealment. In *Lowe v. East End Memorial Hospital and Health Centers*, 477 So.2d 339, (Ala. 1985), the Alabama Supreme Court analyzed a trial court's dismissal of a wrongful death claim under 6-5-410(d) wherein the plaintiff had asserted claims the defendants had fraudulently concealed the wrongful death claim. Again, instead of deciding the appeal on the basis that a claim of fraudulent concealment of a wrongful death claim would be subsumed by the limitations period set forth by § 6-5-410-(d), the Alabama Supreme Court did not do so. Instead, the court upheld the trial court's dismissal, but only on the basis that the plaintiff had failed to plead fraud with particularity. Id.

14

353202

This is yet again a case where the Alabama Supreme Court would not determine that, under an appropriate pleading, a claim of fraudulent concealment would not affect the two year limitations period set forth under § 6-5-410(d).  The Defendants have not asserted that the Plaintiffs have failed to plead fraud with particularity on their fraudulent concealment or suppression claim (nor could they do so), and as set forth in the counterstatement of facts, only through discovery has the full scope and nature of defendants' fraudulent conduct been revealed.

In *DeCosse v. Armstrong Core Co.*, 319 N.W.2d 45 (Minn. 1982), the Minnesota Supreme Court analyzed a wrongful death statute similar to that of Alabama.  In *DeCosse*, a wrongful death action was dismissed by the trial court under the limitations period set forth under Minnesota's wrongful death statute.  Id.  The *DeCosse* Court noted that it had previously "concluded that meeting the requirements of the limitation period was a 'condition precedent' to the right to bring a wrongful death action."  Id. *DeCosse* 319 N.W.2d at 49.  Despite the fact that Minnesota had determined the limitations period under its wrongful death act was a condition precedent to bringing such cause of action, the Minnesota Supreme Court nonetheless undertook an examination of how a claim of fraudulent concealment would affect the limitations period set forth in its wrongful death act.  Id.

The question presented to the *DeCosse* Court was whether "the limitation period [under Minnesota's Wrongful Death Act] would be tolled either because the appellant failed to discover the cause of death, or the respondents fraudulently concealed the facts underlying the cause of action."  *DeCosse* 319 N.W.2d at 49.  While determining that the limitations period should not be tolled under a "discovery rule," the Minnesota

15

Supreme Court nonetheless determined that the limitations period must be extended as a result of the defendants' fraudulent concealment of facts underlying the cause of action. Id.

Irrespective of Minnesota's wrongful death act's limitations period being a condition precedent to bringing a cause of action for wrongful death, it undertook to analyze the illogical result that would follow if the limitations period were not extended as a result of a defendants' fraudulent concealment of the facts underlying the cause of action. As well stated by the *DeCosse* Court, two rationales exist for extending the limitations period based upon a defendant's fraudulent concealment of its acts.

> "First, one who cannot assert his right because the necessary knowledge is improperly kept from him is not within the mischief the statute was intended to remedy; but is within the spirit of the law that restrains its operation. There is no reason, resting on general principles, why ignorance that is the result of the defendant's actual fraud and not the stupidity or lack of diligence of plaintiff should not prevent the running of the statute in favor of the wrongdoer. Secondly, a person should not be permitted to shield himself from the statute of limitations where his own fraud has placed him. He should not be permitted to profit by his own wrong, and it would strike the moral sense strangely to permit him to do so."
>
> *** Fraud is bad, it should not be permitted to go unchecked anywhere, and justice should always be able to penetrate its armor. We are of the opinion that fraudulent concealment tolls the statute of limitations."

319 N.W.2d at 50-51. (emphasis added.)

It would be unjust indeed for this Court or any Court, whether the limitations period under any state's wrongful death act be a statute of limitations or condition precedent to the right of action, to reward a defendant for its fraudulent conduct in concealing pertinent information for a sufficient period of time to prevent a plaintiff from knowing the right of action exists so long as the defendant was sophisticated enough to

16

353202

fraudulently conceal the information beyond the limitations period. The analysis undertaken by *DeCosse* and the moral offensiveness of rewarding such a defendant should hardly need be spelled out. However, it apparently must be spelled out since the defendants' motion is premised on the reprehensible argument that, irrespective of fraudulent concealment or suppression of the dangers and risks of Trasylol, which were kept from physicians utilizing the drug, the public and the FDA, it should prevail on limitations grounds.

Similarly to *DeCosse*, in *Krueger v. St. Joseph's Hospital*, 305 N.W.2d 18 (N.D. 1981), the North Dakota Supreme Court analyzed the limitations period under that state's wrongful death act, which had been interpreted as not having a "discovery rule" attached to it. Similar to the *DeCosse* Court, the Supreme Court of North Dakota likewise found that even though a "discovery rule" did not apply to wrongful death actions, nonetheless where a defendant's fraudulent conduct concealed information regarding the claim, the limitations period set forth in North Dakota's wrongful death act would be extended by virtue of the fraudulent concealment and would further serve to estop a defendant from asserting the defense of limitations because of their fraudulent conduct. Id. Importantly, the *Krueger* Court distinguishes how fraudulent concealment extends the limitations period, as well as estopping a defendant from asserting the affirmative defense of statute of limitations.

As stated by the *Krueger* Court:

"estoppel, in the context where it is urged as a defense to the statute of limitations is concerned with the actions of one guilty of wrongdoing, and operates to preclude the application of the statute of limitations as a defense by the wrongdoer. While the discovery rule is not applicable to actual wrongful death, estoppel, whether based on fraud,

17

353202

> fraudulent concealment, misrepresentation, or deception, is available in wrongful death actions."

Id. at 25.

Similar to *Krueger*, other courts have likewise held that fraudulent concealment would serve to estop a defendant from benefiting from their fraud by estopping them from the application of a statute of limitations defense. See e.g. *Baker v. Beech Aircraft Corp.*, 39 Cal.App.3d 315, 114 Cal.Rptr. 171 (1974) (actual fraud will estop the defense of statute of limitations where there have been active misrepresentations or purported disclosures which actually suppress material facts); *Rickman v. Cone Mills Corp.*, 129 F.R.D. 181 (D. Kan. 1989) (doctrine of fraudulent concealment operates as equitable doctrine to estop defendant from asserting statute of limitations); *Norfolk Southern Ry. v. Trinity Industries Inc.*, 2009 W.L 856340 (N.D. Texas 2009)(fraudulent concealment estops a defendant from relying on statute of limitations); *University of Pittsburgh v. Townsend*, 543 F.3d 513 (6th Cir. 2008) (under Pennsylvania law, the doctrine of fraud, fraudulent concealment served to estop a Defendant from asserting statute of limitations); *O. K. Sand and Gravel, Inc. v. Martin Marrietta Corp.*, 786 F. Supp. 1442 (S.D. Ind. 1992) (fraudulent concealment operates as an equitable doctrine to estop a defendant from asserting statute of limitations); *Cox v. Upjohn Company*, 913 S.W.2d 225 (1995) (statute of limitations on wrongful death did not abolish fraudulent concealment as estopping affirmative defense of limitation in wrongful death action). Estopping a defendant from asserting an affirmative defense of statute of limitations is consistent with the generally recognized reasoning that a defendant should not benefit from their fraudulent conduct.

18

In Count IV of the First Amended Complaint, the plaintiff asserts estoppel and requests, that because the defendants fraudulently concealed or suppressed information regarding the dangers or risks of Trasylol, the defendants should be "estopped from asserting any statute of limitations as a defense to this action." *See* Exhibit 1, First Amended Complaint.  In addition to the allegations giving rise to fraudulent concealment and suppression, the plaintiff, as set forth in their counterstatement of facts, have uncovered a pattern and practice, pre-dating Summerlin's surgery, regarding the Defendants' concealing and suppressing information regarding the dangers and risks associated with the use of Trasylol. Consistent with other federal and state courts which have found that fraud on the part of a defendant, if proven, would estop a defendant from relying upon the statute of limitations as a defense, Alabama has recognized that estoppel would bar a Defendant who has acted fraudulently from relying upon the statute of limitations as a defense. See e.g. *City of Birmingham v. Cochrane Roofing and Metal Co., Inc.*, 547 So.2d. 1159 (Ala., 1989); *Mason v. Mobile County*, 410 So.2d 19 (Ala., 1982). In applying estoppel as a bar to the affirmative defense of statute of limitations, the issue of whether or not there is sufficient evidence to present a jury question on estoppel is based upon a "scintilla of evidence" standard.  See e.g. *Hammond v. City of Gadsden*, 493 So.2d 1374 (Ala., 1986) (question of estoppel was submitted to the jury ... by reviewing the evidence in light most favorable to plaintiff, we find at least a scintilla of evidence to let the jury decision on the issue stand).

In the case at bar, it is clear that the Defendants' Motion for Summary Judgment on the statute of limitations should be denied.  It would violate all concepts of justice if

19

the Defendants would be able to profit from their fraudulent conduct by asserting a bar to a wrongful death claim simply because they were able to conceal or suppress information regarding the dangers and risks of Trasylol long enough. Not only has the Alabama Supreme Court, when presented with an opportunity to find such an absolute bar exists and did not, but other jurisdictions with similar wrongful death limitation periods have held that fraudulent concealment would extend the limitations periods. Further, Alabama absolutely recognizes that fraudulent concealment may, where a scintilla of evidence is presented, allow the issue of estoppel of the statute of limitations be presented to the jury.

Under the facts asserted and discovered through this litigation, the Defendants have failed to demonstrate the limitations period for wrongful death claims would not be extended on cases of fraudulent concealment. Further, the issue of estoppel should be presented as a jury question and based upon the facts set forth above, create far in excess of a scintilla of evidence necessary for a jury determination on that issue.

## II.   QUESTIONS OF FACT EXIST ON THE WARRANTY CLAIMS WHICH WOULD PRECLUDE THE GRANTING OF SUMMARY JUDGMENT

The Defendants assert that plaintiff's cause of action does not give rise to any breach of implied or express warranty. In order to reach their conclusion, they recharacterize the allegations contained in Plaintiff's complaint in order to argue that the warranties do not survive under Alabama law. Despite the fact that Count III of the Complaint specifically alleges breach of warranty, both express and implied, as a result of the fact the Defendants "expressly and impliedly warranted that Trasylol was safe for the use for which it was intended," the Defendants attempt to recharacterize the

20

353202

allegations to argue the AEMLD subsumes the claims and do not survive under
Alabama law.

In support of their argument that the warranty claims do not survive, the
Defendants cite several cases which have no application to this case. One of the cases
cited by the Defendants is *Shell v. Union Oil Co.*, 489 So.2d 569 (Ala. 1986). The *Shell*
case dealt with the implied warranty of merchantability concerning benzene, a known
carcinogen. Id. In determining that the product containing benzene was fit for the
ordinary purpose for which it was used, the court noted that the product performed as it
was supposed to, but further noted that the warnings adequately described the inherent
dangers. Id. Here, it is asserted that Trasylol contained insufficient warnings regarding
the risks of its use which were withheld by the Defendants. As a result of these risks,
which were not adequately set forth in its warnings, Trasylol was not fit for its intended
purpose. The significant risk and danger of Trasylol, in fact, made in unfit for the
purpose for which it was used.

*McClain v. Metabolife Intern., Inc.* 193 F.Supp.2d 1252 (N.D. Ala. 2002), has also
been cited by the Defendants, although mischaracterized for purposes of arguing
Alabama law would preclude the warranty claims being asserted. In *McClain*, the
plaintiffs alleged defendant breached implied warranties of merchantability and fitness
for a particular purpose. The court specifically noted:

> "Plaintiffs do not contend that Metabolife 356 was not fit for the
> purpose for which it was sold, i.e. weight loss. The essence of their claim
> is that Metabolife 356 is unreasonably dangerous, and lacked minimally
> appropriate warnings of the product's latent dangers."

21

Id at 1258. In the case at hand, Plaintiff does in fact, contend that Defendants breached implied and express warranties making the drug unfit for its intended purpose. *See* Exhibit 1.

Lastly, Defendants cite *Bodie v. Purdue Pharmaceuticals Co.*, 236 Fed.Appx. 511 (11th Cir. 2007), for the proposition that warranty claims do not exist on prescription drugs. Again, the facts of *Bodie* are distinguishable from this case. While the Northern District of Alabama dismissed the implied warranty claims of merchantability in Bodie, the Court specifically noted that the allegations were that "Purdue breached the implied warranty of merchantability because Oxycontin was 'not of merchantable quality,' was 'unsafe,' and was 'unreasonably dangerous.'"

Reliance of *Bodie* for the proposition that warranty claims are inapplicable to pharmaceutical products is without merit. In *Bodie*, the physician testified that he was aware what the propensity of Oxycontin to producing addiction and that there was a specific black box warning to that effect. Id. In this case, it is distinguishable based upon the fact that the risks and dangers of Trasylol were not made known to the surgeon prescribing the drug, Dr. Ronson, who testified that once the reports began to be published regarding the dangers and side effects of Trasylol, he discontinued its use in his patients. The information, which Bayer knew prior to Summerlin's surgery was withheld, and the side effects that were later revealed, but previously known by Bayer, made the product unfit for the particular purpose for which it was intended.

For the reasons above, Defendants' motion for summary judgment on the warranties must fail. The issue of whether or not any implied or express warranties were breached is a question of fact for the jury, precluding summary judgment on these claims. See e.g. *Barrington Corp. v. Patrick Lumber Co., Inc.*, 447 So.2d 785 (Ala.

1986) (warranty is ordinarily a question of fact to be determined by the fact finder).

### III.   PLAINTIFF CAN SUSTAIN A CLAIM FOR FRAUDULENT CONCEALMENT AND/OR SUPPRESSION AND THERE IS A GENUINE ISSUE OF MATERIAL FACT THAT PLAINTIFF RELIED UPON SUCH.

The Defendants first argue that Plaintiff is barred from asserting a claim for fraudulent concealment because such a claim does not survive Plaintiff's decedent's death. Plaintiff's claims of fraudulent concealment and/or fraudulent suppression, are viable causes of action as the Defendants cannot be rewarded for its intentional wrongdoing to conceal material facts concerning the risks and dangers of Trasylol. *See* Argument I.

Count IV of the Amended Complaint asserts claims for both fraudulent concealment and fraudulent suppression of significant risks and dangers in regards to Bayer's marketing and sale of Trasylol which prevented Plaintiff from discovering his claim at the time of his wife's death in March 2006. To sustain a claim for fraudulent concealment or suppression under Alabama law, a plaintiff must produce substantial evidence establishing: (1) a duty on the part of the defendant to disclose; (2) the defendant's suppression of material facts; (3) the defendant's knowledge of the facts and their materiality; (4) action by the plaintiff in reliance on the suppression; and (5) damages resulting from the reliance action. Ala.Code § 6-5-102; *Wolff v. Allstate Life Insurance Company*, 985 F.2d 1524 (11th Cir.1993) (citing *Hardy v. Blue Cross & Blue Shield*, 585 So.2d 29, 32 (Ala.1991)). In its argument, the Defendants assert only that Plaintiff cannot meet the element of reliance.

"To claim reliance upon a misrepresentation, the allegedly deceived party must have *believed it to be true*." *Smith v. J.H. Berry Realty Co.*, 528 So.2d 314, 316

23

(Ala.1988) (emphasis added). Further, [w]hether a plaintiff has reasonably relied on a defendant's misrepresentation is usually a question of fact. *Cf. Foremost Ins. Co. v. Parham,* 693 So.2d 409, 421 (Ala.1997)(stating that "[t]he 'reasonable reliance' standard ... allow[s] the factfinder ... flexibility in determining the issue of reliance based on all of the circumstances surrounding a transaction, including the mental capacity, educational background, relative sophistication, and bargaining power of the parties"). *McIver v. Bondy's Ford, Inc.,* 963 So.2d 136, 142-143 (2007).

In *Bondy,* a used-car dealership argued that it had relied upon representations by the prior owner that there had been no prior water damage and that had it had such information it would have performed a more detailed inspection of the vehicle before purchase. *Id.* The plaintiff argued that the dealership did not reasonably rely upon the representations of the prior owner because it had performed its own investigation/inspection of the used vehicle which should have revealed the existence of prior water damage. *Id.* In upholding the judgment in favor of the dealership and finding that it had reasonably relied upon the representations, the Court of Civil Appeals of Alabama cited to the guidelines established by the Supreme Court of Alabama in *Torres v. State Farm Fire & Casualty Co.,* 438 So.2d 757 (Ala.1983),

> In order to recover for misrepresentation, the plaintiff's reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover."

Similar to *Bondy,* Plaintiff and his decedent, to their detriment, relied upon the truthful information provided to them by Dr. Ronson regarding the risks of her heart surgery. Plaintiff and his decedent reasonably relied upon the risk/benefit analysis provided by Dr. Ronson based upon the truth of the information available to him.

24

353202

Additionally, due to the concealment of Bayer regarding the increased risks of Trasylol, no reasonable investigation could have or should have been conducted by Plaintiff prior to her heart surgery. She had no reason to question the calculated risks provided to her by Dr. Ronson prior to her surgery in March 2006.

In support of their position that no reliance exists, the Defendants cite to *Holton v. Blue Cross & Blue Shield of S.C.*, 56 F. Supp. 2d 1338 (M.D. Ala 1999). Defendants' reliance, however, is misplaced. *Holton* was a claim for fraud by a licensed professional counselor in the State of Alabama and a listed provider of mental health services under the CHAMPUS/TRICARE program arising from the Defendants' alleged non-payment for mental health services provided by Holton to CHAMPUS/TRICARE beneficiaries. *Id.*, p. 1341 (M.D.Ala.,1999). In upholding summary judgment in favor of the defendants, the Court found that the plaintiff had been advised of the reasons his claims were not paid; they had not been suppressed. *Id.* Further, the court found that the plaintiff had failed to demonstrate that he relied upon a representation of the Defendants since the requirements for payments of claims were clearly stated in the TRICARE Handbook and forms to be completed for approval or disapproval of services prior to rendering treatment. *Id.* The Court reasoned that since plaintiff had made the decision to treat patients while he had access to the Handbook and other information, he could not reasonably rely upon an alleged misrepresentation by the Defendants. *Id.*

Distinct from *Holton*, the only information Plaintiff and his decedent had to rely upon in order to decide whether to undergo surgery on March 16, 2006, was that provided to her by Dr. Ronson regarding the attendant risks and benefits of the surgery. In this case, it is abundantly clear that Dr. Ronson relied upon the information provided to him as a physician regarding Trasylol. Mrs. Summerlin, as evidenced by her consent

25

to surgery, relied upon the risk benefit analysis performed by Dr. Ronson in deciding to undergo heart surgery on March 16, 2006, including the risks of medications like Trasylol that may be used. Unfortunately, Mrs. Summerlin and Dr. Ronson relied upon the truth of the information Bayer decided to make available at the time; without the benefit of information known to Bayer and concealed afterward which led Dr. Ronson to stop using Trasylol in his patients. Id.

As conceded by the Defendants in Footnote 7 of the Motion, "In Alabama, it is not always necessary to prove that a misrepresentation was made directly to the person who claims to have been injured." *Ex parte DaimlerChrysler Corp.*, 952 So.2d 1082, 1090 (Ala.,2006). In fact, the entire basis for third party standing in misrepresentation cases is that the deceiver contemplated that the third party would be induced to act by the deceiver's misstatements made to someone else. *Id.*, p. 1090-1091 (citing, *Sims v. Tigrett*, 229 Ala. 486, 158 So. 326, 330 (1934). Alabama courts have explicitly held that vendors who knew or should have known that any misrepresentations made to purchasing entity or person would reach another, could be held liable to the other. *See Wheelan v. Sessions*, 50 F.Supp.2d 1168 (M.D.Ala.,1999).

In *Bloodsworth v. Smith & Nephew,* 417 F.Supp.2d 1249 (M.D.Ala., 2006), the Court considered whether a patient who was implanted with a prosthetic hip could sustain a claim for fraudulent suppression or misrepresentation against a nonresident manufacturer and manufacturer's resident sales representative. *Id.* The court noted that patient was not the direct recipient of the alleged misrepresentations and/or omissions; rather, the physician was. *Id.* The Court stated that consistent with its prior rulings in the case, the fact that the patient was not the "hearer" is not fatal to her fraud claims against the Defendants because an argument can be made that, by

26

353202

promoting its products to the physician, the Defendants intended to reach and influence his patients. *Id.*, p. 1251 (M.D.Ala., 2006).

Bayer fraudulently concealed studies and information from physicians, patients and the general public with reckless disregard for the public health and welfare in order to maximize Bayer's profits for the vast majority of a decade. This intentional concealment of adverse information regarding Trasylol was Bayer's attempt to conceal the dangers of its drug, including acute kidney injury, cardiac complications and even death. In this case, such information was clearly concealed from Dr. Ronson who after obtaining the suppressed information, ceased utilization of the drug during his heart surgeries. To Plaintiff's detriment, such information was concealed and/or suppressed at the time of Mrs. Summerlin's surgery on March 16, 2006. The Plaintiff relied upon the information available – the risk-benefit analysis of the surgery performed by Dr. Ronson which included consideration for Trasylol. Hence, both Plaintiff and Plaintiff's decedent's reliance of the misinformation is a question for the jury precluding summary judgment.

## CONCLUSION

WHEREFORE, Plaintiff, Melvin E. Summerlin, ("Plaintiff") respectfully requests denial of Defendants' motion for summary judgment. Plaintiff can sustain his wrongful death claims (on theories of negligence and product liability) because the claims were fraudulently concealed by the Defendants and were brought within two years after the discovery of the claim. Plaintiff's breach of warranty claims are clearly viable causes of action under Alabama law. Finally, plaintiff's claims for either fraudulent concealment and/or fraudulent suppression because the Plaintiff and Plaintiff's decedent relied upon

27

the truth of the information provided regarding his wife's heart surgery and did so to their detriment.

Melvin E. Summerlin,
**PLAINTIFF**

**By Counsel**

P. Gregory Haddad, Esq.
ghaddad@baileyglasser.com
Kerrie Wagoner Boyle, Esq.
kboyle@baileyglasser.com
Jonathan D. Boggs, Esq. (FL Bar #0106305)
jboggs@baileyglasser.com
Bailey & Glasser, LLP
209 Capitol Street
Charleston, West Virginia 25301
(304) 345-6555
(304) 342-1110 facsimile

Leslie Ann Caldwell
lac@lusklaw.com
LUSK, CALDWELL & DEAN P.C.
2101 Highland Avenue, Suite 410
Birmingham, Alabama 35205
(205) 933-7090 Telephone
(205) 933-7099 Facsimile

28

353202

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:08-MD-01928-MIDDLEBROOKS/JOHNSON

IN RE: TRASYLOL PRODUCTS LIABILITY
LITIGATION – MDL-1928

This Document Relates To:

SUMMERLIN v. BAYER CORPORATION, ET AL.,
Case No. 9:08-cv-80903

## CERTIFICATE OF SERVICE

I hereby certify that on the 21st day of December, 2009, *PLAINTIFF MELVIN E. SUMMERLIN'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT* was served by United States First Class Mail, postage pre-paid, upon the following counsel of record:

Brian A. Wahl
Bradley, Arant, Rose & White, LLP
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203

Phillip S. Beck
Bartlit Beck Herman Palenchar & Scott LLP
Courthouse Place
54 West Hubbard Place, Suite 300
Chicago, IL 60610

Patricia Elaine Lowry
Barbara Bolton Litten
Squire Sanders & Dempsey LLP
777 S Flagler Drive, Suite 1900
West Palm Beach, FL 33401-6198

Elizabeth C. Curtin
Sidley Austin LLP
1 S Dearborn Street
Chicago, IL 60603

353202

Richard K. Dandrea
Eckert Seamans Cherin & Mellott, LLC
600 Grant Street, 44th Floor
Pittsburgh, PA 15219

Daniel G. Wyllie
Dykema Gossett
400 Renaissance Center, 35th Floor
Detroit, MI 48243

Jonathan D. Boggs, Esq. (FL Bar #0106305)
*jboggs@baileyglasser.com*

30

## 798244637316

Details    Associated Shipments    Notifications    Notes

**Ship Date: 12/21/2009 Monday**

**Bailey & Glasser, LLP**
c/o Kerrie Wagoner Boyle
2855 Cranberry Square
Morgantown, WV, US, 26508
(304) 594-0087



Initiated    Pi

**Delivered:**
Si

### Shipment Facts

| | |
|---|---|
| Tracking Number | 798244637316 |
| Reference | **Trasylol** |
| Signed for by | D.JONES |
| Shipment Type | Single Piece Shipment |
| Pieces | 1 |
| Service | FedEx Priority Overnight |
| Delivery Attempts | 1 |

### Shipment Travel History

**Dec. 22, 2009**

| | |
|---|---|
| 1:15 PM | Delivered |
| 09:28 AM | On FedEx vehicle for delivery |
| 08:56 AM | At local FedEx facility |
| 07:49 AM | At dest sort facility |
| 04:59 AM | Departed FedEx location |

**Dec. 21, 2009**

| | |
|---|---|
| 7:12 PM | Left FedEx origin facility |
| 6:30 PM | Picked up |
| 4:34 PM | Shipment information sent to FedEx |

Details last updated: 4:31 PM

# TLivengood

**Flash**
**12/22/09   05:41 PM**



## IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ALABAMA
### NORTHERN DIVISION

MELVIN E. SUMMERLIN, as Executor of the
Estate of Frances Summerlin, deceased

       Plaintiff,

v.                                                            Civil Action No.: 2:08-cv-00251

BAYER CORPORATION;
BAYER HEALTHCARE, LLC; BAYER
HEALTHCARE PHARMACEUTICALS, INC.;
BAYER HEALTHCARE A.G.

       Defendants.

## FIRST AMENDED COMPLAINT

Plaintiff, Melvin E. Summerlin as Executor of the Estate of Frances Summerlin, deceased, by and through counsel, files this Amended Complaint seeking judgment against Defendants Bayer Corporation, Bayer Healthcare, LLC, Bayer Healthcare Pharmaceuticals, Inc., and Bayer Healthcare A.G. This case arose out of the Defendants' sale and marketing of the drug Trasylol, also known as Aprotinin, and their failure to warn of its dangers.

### Jurisdiction and Venue

1.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because complete diversity exists and the amount in controversy exceeds $75,000.00 excluding interest and costs.

250490



2.    This Court has personal jurisdiction over the defendants to this action because they possess the requisite minimum contacts with the forum.

3.    Venue is proper in this district because all the defendants reside in this district, as the term "reside" is defined in 28 U.S.C. § 1391(c).

<u>Parties</u>

4.    Plaintiff, Melvin E. Summerlin, is a citizen of Alabama and has been duly appointed Executor of the Estate of Frances Summerlin, deceased. This estate is now pending in the Probate Court of Dallas County, Alabama, Case No. 08-071.

5.    Defendant Bayer Corporation, (hereinafter "Bayer"), is an Indiana corporation, registered to do business and doing business in Alabama, with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania, 15205. At all relevant times, Bayer Corporation was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and selling in interstate commerce, including in the state of Alabama, the drug Trasylol, also known as Aprotinin.

6.    Defendant Bayer Healthcare, LLC, is a Delaware limited liability company, registered to do business and doing business in Alabama. At all relevant times, Bayer Healthcare, LLC was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and selling Trasylol in interstate commerce, including in the state of Alabama.

7.    Defendant Bayer Healthcare A.G., a global diversified chemical company, is a German corporation, with its principal place of business in Leverkusen, Germany. At all times relevant herein, Bayer Healthcare A.G. was in the business of

designing, testing, manufacturing, distributing and promoting certain pharmaceutical products, including Trasylol.  Additionally, at all times relevant, Bayer Corporation and Bayer Healthcare A.G. shared many of the same officers and directors.

8.    Defendant Bayer Healthcare Pharmaceuticals, Inc. is a Delaware corporation, registered to do business and doing business in Alabama, and successor to Defendant Bayer Pharmaceuticals Corporation, with its principal place of business at 400 Morgan Lane, West Haven, Connecticut 06516.  At all relevant times, Bayer Healthcare Pharmaceuticals, Inc. was engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, and selling Trasylol in interstate commerce, including in the state of Alabama.

## Facts

### History of Trasylol

9.    Trasylol (also known as Aprotinin Injection) is a naturally occurring proteolytic enzyme inhibitor obtained from bovine lung.

10.    Aprotinin was discovered in the 1930s when Kraut et al isolated a kallikrein inhibitor from bovine lung.

11.    Aprotinin was launched as Trasylol in Germany in 1959.

12.    Trasylol was approved by the FDA in 1993 and is used to control bleeding in open heart surgeries.  It is supplied as a clear, colorless, sterile isotonic solution for intravenous administration.

13.    Trasylol is indicated for prophylactic use to reduce perioperative blood loss and the need for blood transition in patients undergoing cardiopulmonary bypass surgery.

14.   Trasylol is a broad spectrum protease inhibitor, which modulates the systemic inflammatory response associated with cardiopulmonary bypass surgery. The effects of Trasylol use in cardiopulmonary bypass surgery involve a reduction in inflammatory response, which translates into a decreased need for blood transfusions.

15.   Trasylol inhibits pro-inflammatory cytokine release and maintains glycoprotein homeostasis.

16.   According to Bayer, since its approval, an estimated 4.3 million patients have been given Trasylol.

17.   Bayer estimated that Trasylol generated about $293 million in sales in 2005 alone, making it the company's 11th largest-selling drug.

18.   In late 2005, Bayer forecast that Trasylol would someday generate upwards of $600 million annually.

**Trasylol's Association with the Increased Risk of Renal Failure**

19.   On January 26, 2006, *The New England Journal of Medicine* (NEJM) published an article by Mangano et al reporting an association of Trasylol with, among other things, serious renal toxicity in patients undergoing coronary artery bypass grafting surgery.  This study was an observational study of patients who received either Trasylol, one of two alternative drugs intended to decrease perioperative bleeding (aminocaproic acid or tranexamic acid), or no specific drug treatment.

20.   The FDA evaluated this study, along with other studies in the literature, and reports submitted to the FDA through the MedWatch program, to determine if labeling changes or other actions were warranted.

21.   While the FDA was continuing its evaluation it provided the following

recommendations to healthcare providers and patients:

> Physicians who use Trasylol should carefully monitor patients for the occurrence of toxicity, particularly to the kidneys, heart, or central nervous system and promptly report adverse event information to Bayer, the drug manufacturer, or to the FDA MedWatch program, as described at the end of this advisory.
>
> Physicians should consider limiting Trasylol use to those situations where the clinical benefit of reduced blood loss is essential to medical management of the patient and outweighs the potential risks.

### FDA September 21, 2006 Advisory Board Committee Meeting and the Walker ("I3") Study

22.  On or before February 1, 2006, and within two weeks of the publication of Dr. Mangano's research, high level managers at Bayer contacted Dr. Alexander Walker, a professor at Harvard's School of Public Health, and a researcher at I3 Drug Safety, a company that conducts drug safety studies for the pharmaceutical industry, and provides "integrated global pharmacovigilance services." Bayer wanted to conduct its own study to determine, for the first time, whether Trasylol was as safe as its alternatives. This became known as the "I3 Study."

23.  On or about February 8, 2006, the FDA issued a Public Health Advisory on the results of Dr. Mangano's research on Trasylol. The FDA also stated that it would hold an advisory committee meeting on Trasylol.

24.  On or about February 20, 2006, Bayer disclosed to German regulators that it was considering conducting a study on Trasylol's safety using a database from the United States. On information and belief, Bayer was referring to the I3 Study.

25.  On or about February 23, 2006, Bayer's upper management contacted Dr.

Walker and asked him to present the results of the I3 Study to the FDA at the planned September meeting.

26.   On or about June 1, 2006, Bayer approved the I3 Study, and communicated its approval to Dr. Walker on or about June 2, 2006. At that time, Bayer told Dr. Walker to complete the I3 Study in time to for the FDA Advisory Committee meeting, then scheduled for September 21, 2006.

27.   On or about June 19, 2006, Bayer forwarded an executed copy of its contract for the I3 Study to Dr. Walker. The cost of the study was $700,000 to be paid in five installments.   Under the contract, preliminary results were due within three months (on or about September 19, 2006), and a final report was due a month after that.

28.   On or about June 28, 2006, Bayer had a telephone conference with the FDA, but did not advise the FDA about the I3 Study during that call.

29.   On or about July 13, 2006, Bayer again asked Dr. Walker to present the results of the I3 Study at the FDA Advisory Committee meeting scheduled for September 21, 2006. Bayer informed Dr. Walker that a written submission in advance of the Advisory Committee meeting was due to the FDA by August 18, 2006.

30.   On or about July 16, 2006, members of Bayer's upper management met to prepare for a meeting with FDA officials scheduled for the next day.   Some Bayer officials present at the meeting recall discussing the I3 Study and whether to inform the FDA about the I3 Study at the next day's meeting.

31.   On or about July 17, 2006, members of Bayer's upper management met with FDA officials in Silver Spring, Maryland.   No one informed the FDA officials of the

250480

i3 Study at that meeting.

32.   On the same day as the July 17, 2006 FDA meeting in Maryland, Dr. Walker confirmed that he would present the results of the i3 Study at the FDA Advisory Committee meeting. Another i3 scientist, John Seeger, stated that the i3 Study results would not be ready in time for the pre-meeting submission, but suggested that the written submission include a description of the i3 Study.

33.   On or about July 22, 2006, Bayer held a mock panel meeting in New York to prepare for the FDA Advisory Committee meeting. The participants in the mock FDA meeting did not discuss the i3 Study.

34.   On or About August 17, 2006, Bayer made its pre-meeting written submission to the FDA. It did not mention the i3 Study.

35.   On or about August 17, 2006, i3 personnel told Bayer that the i3 Study was on track to deliver preliminary results on September 19, 2006, as stated in the contract. At the same time, i3 scientist John Seeger suggested that he and Dr. Walker meet with Bayer management in Lisbon, Portugal in late August 2006, to discuss the i3 Study. That meeting occurred on or about August 26, 2006.

36.   On or about August 19, 2006, Bayer held a second mock panel meeting in New York to prepare for the FDA Advisory Committee meeting. At that panel meeting, a member of Bayer's management team falsely reported that no results from the i3 Study would be available before the FDA Advisory Committee meeting.

37.   On or about September 7, 2006, Dr. Walker informed Bayer that the preliminary results were ready, and that he was prepared to give Bayer a summary of the findings. On September 8, 2006, however, Dr. Walker withdraws his offer to

discuss the results.

38.  On or about September 9, 2006, Bayer held a third mock panel meeting in New York to prepare for the FDA Advisory Committee meeting.

39.  On or before September 14, 2006, Bayer received the preliminary report of the i3 Study's findings.  The preliminary report suggested that patients who received Trasylol were at an increased risk for death, kidney failure, congestive heart failure, and stroke.

40.  On or about September 20, 2006, Bayer held a final mock panel meeting in preparation for the FDA Advisory Committee meeting scheduled for the next day. The participants in that meeting did not mention the i3 Study or the preliminary results they received six days earlier.

41.  The FDA Advisory Committee met on September 21, 2006 to discuss its findings regarding the safety of Trasylol and determine whether the warning on Trasylol needed to be changed.  No one from Bayer mentioned the i3 Study or the preliminary report Bayer received on or before September 14, 2006.  Bayer did not bring Dr. Walker to the meeting to discuss his findings.

42.  After reviewing what it considered to be all of the available data on the safety of Trasylol, the 19-member advisory panel recommended to the FDA that Defendant Bayer did not need to strengthen a warning to doctors about the drug.

43.  On or about September 26, 2006, Dr. Walker told Bayer that the preliminary report had implications for public health and insisted that it be given to the FDA.

44.  Bayer disclosed the preliminary report to the FDA on September 27,

2006.

45.   On December 15, 2006, the FDA sent an Alert to healthcare professionals advising of a change in the product label for Trasylol:

> The new labeling for Trasylol (December 2006) has a more focused indication for use, a new Warning about renal dysfunction, a revised Warning about anaphylactic reactions, and a new Contraindication. Trasylol is now indicated only for prophylactic use to reduce perioperative blood loss and the need for blood transfusion in patients who are at *an increased risk for blood loss and blood transfusion* undergoing cardiopulmonary bypass in the course of coronary artery bypass grafting (CABG) surgery. Trasylol should be administered only in the operative setting where cardiopulmonary bypass can be started quickly. Trasylol should not be administered to any patient with a known or suspected exposure to Aprotinin within the past 12 months.

> FDA is evaluating additional recently submitted epidemiological safety study data (discussed below), in the context of all other safety and efficacy information available on Aprotinin. This review may result in other actions, including additional changes to the full prescribing information (product labeling).

46.   In December 2006, Bayer revised the label for Trasylol to include a specific statement in the WARNING section of the label that use of Trasylol creates an increased risk of renal dysfunction and renal failure.

47.   In February 2007, Bayer responded to the study and commentary published in the Journal of American Medical Association (JAMA). In commenting on the study published by Dr. Mangano in the January 2006 JAMA, Bayer stated, "Bayer believes the methodological and analytical approaches used in earlier study were not reliable and do not support the authors' reported conclusions." Bayer went on to say: "Bayer believes that the results of this study should not serve as a basis for affecting the use of aprotinin in clinical practice."

48.   On November 5, 2007, Bayer suspended worldwide marketing of Trasylol.

280460

### General Allegations Concerning Plaintiff

49.     On or about March 16, 2006, Frances Summerlin had open heart surgery at Brookwood Medical Center, Birmingham, Alabama.

50.     With no contributory negligence on her part, Frances Summerlin was administered Trasylol.

51.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, Frances Summerlin began experiencing medical complications soon after her open heart surgery, including renal failure.

52.     As a direct, proximate, and legal result of the negligence, carelessness, and other wrongdoing of the Defendants, Frances Summerlin died on March 26, 2006.

### Count I – Wrongful Death
### (Negligence/Wantonness)

53.     Plaintiff incorporates by reference all the above paragraphs as if they were set forth fully.

54.     At all relevant times, Defendants owed Frances Summerlin a duty of reasonable care and safety.

55.     Defendants' duties included, but were not limited to, carefully and properly designing, testing, manufacturing, licensing, packaging, promoting, advertising, selling, and/or distributing Trasylol into the stream of commerce, and providing warnings with regard to this drug.

56.     Defendants negligently, carelessly, and/or wantonly breached the above-described duties to Frances Summerlin by committing negligent and/or wanton acts

250490

and/or omissions including but not limited to:

(A) Defendants negligently and/or wantonly failed to use ordinary care in designing, testing, and manufacturing Trasylol so as to avoid the high risk to users of unreasonable, dangerous side-effects, some of which are fatal, such as renal failures;

B) Defendants negligently and/or wantonly failed to accompany Trasylol with adequate warnings that would alert doctors, consumers, and other users to the potential adverse side effects associated with the use of these drugs and the nature, severity and duration of such adverse effects;

(C) Defendants negligently and/or wantonly failed to conduct adequate pre-clinical testing and post-marketing surveillance to determine the safety and side effects of Trasylol;

(D) Defendants negligently and/or wantonly failed to warn Plaintiff's intestate prior to actively encouraging the sale of Trasylol, either directly or indirectly, orally or in writing, about the possibility of death as a result of the use of these drugs;

(E) Defendants negligently and/or wantonly continued to promote the safety of Trasylol®, while downplaying any risks, even after Defendants knew of the risk of renal failure; and

260400

(F) Defendants were otherwise careless or negligent and/or wanton.

57.    Although Defendants knew or should have known that Trasylol caused unreasonably dangerous side effects which many users would be unable to remedy by any means, Defendants continued to market this drug to doctors for use in cardiac surgeries, when there were safer and less expensive alternatives available.

58.    Defendants knew or should have known that consumers, like Frances Summerlin, would suffer injury or death as a result of Defendants' failure to exercise ordinary care, as described above.

59.    As a direct and proximate cause of Defendants' negligent and/or wanton acts and/or omissions, Plaintiff's intestate died.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for punitive damages for wrongful death, in an amount determined by a jury, plus costs and interest, and such other and further relief to which Plaintiff may be entitled.

**Count II – Wrongful Death
(Product Liability/AEMLD)**

60.    Plaintiff incorporates by reference all the above paragraphs as if they were set forth fully.

61.    At all relevant times, Defendants designed, manufactured, and tested

250400

Trasylol.

62.    At all relevant times, Defendants were engaged in the business of distributing and selling Trasylol.

63.    Defendants sold the Trasylol, which was administered to Frances Summerlin during her cardiac surgery, as alleged in this Amended Complaint.

64.    The Trasylol administered to Frances Summerlin was defective and, because of its defects, was unreasonably dangerous to persons who might reasonably be expected to require its use. In addition, this drug was dangerous to the extent beyond that which could reasonably be contemplated by Frances Summerlin, and any benefit of this drug was far outweighed by the serious and undisclosed risks of its use. Among other things, Trasylol is defective in design and failure to warn.

65.    The Trasylol administered to Frances Summerlin was defective at the time it was distributed by the Defendants or left its control.

66.    The Trasylol administered to Frances Summerlin was expected to reach the user without substantial change in the condition in which it was sold.

67.    The Trasylol administered to Frances Summerlin reached her without substantial change in the condition in which it was sold.

68.    Frances Summerlin was a person who would reasonably be expected to use Trasylol.

69.    The defects in the Trasylol administered to Frances Summerlin were a

direct and proximate cause of the death of Frances Summerlin as set forth in this Amended Complaint.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for punitive damages for wrongful death, in an amount determined by a jury, plus costs and interest, and such other and further relief to which Plaintiff may be entitled.

### Count III - Breach of Warranties

70. Plaintiff incorporates by reference all the above paragraphs as if they were set forth fully.

71. Trasylol was designed, tested, manufactured, distributed, promoted and sold by the Defendants; and was expected to, and did, reach Frances Summerlin without a substantial change in its condition.

72. Defendants, through their advertising and promotional materials, expressly and impliedly warranted that Trasylol was safe for the use for which it were intended, namely as a means to reduce perioperative bleeding in patients undergoing cardiac surgery.

73. Defendants breached these express and implied warranties because Trasylol was unsafe in light of the risk of life-threatening side effects associated with its use, including, but not limited to, renal failure.

250480

74.  Frances Summerlin relied to her detriment on Defendants' express and implied warranties.

75.  As a direct and proximate result of Defendants' breach of express and implied warranties, Frances Summerlin died, as set forth in this Amended Complaint.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for damages for breach of warranty and punitive damages for wrongful death, in an amount determined by a jury, plus costs and interest, and such other and further relief to which Plaintiff may be entitled.

### Count IV – Fraudulent Concealment and Estoppel

76.  Plaintiff incorporates by reference all the above paragraphs as if they were set forth fully.

77.  At all times relevant hereto, Bayer knew or should have known of the dangers of administering Trasylol to patients, such as Mrs. Summerlin.

78.  Because of the Defendants' specialized position and unique knowledge of these dangers and risks, Defendants had a duty to disclose to Plaintiff and the public the hazards associated with administering Trasylol during surgery.

79.  Defendants nevertheless intentionally suppressed and/or concealed their knowledge of these hazards and the risks associated with administering Trasylol to the public, including the Plaintiff.  Defendants intentionally misrepresented results of their own study as well as suppressed findings from its own study that supported Dr. Mangano's findings that Trasylol increased a patient's risk for kidney failure, kidney

250480

damage, stroke and/or death.

80.    As a proximate result of Defendants' suppression and/or concealment of their knowledge of this information related to Trasylol, Plaintiff has suffered harm.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, on his claim of fraudulent concealment.  The Court should hold that the applicable statute of limitations was tolled for the duration of the concealment, find that Defendants are estopped from asserting any statute of limitations as a defense to this action, and award compensatory and punitive damages and all other relief this Court or a jury finds just and proper.

**PLAINTIFF DEMANDS A JURY TRIAL**

                                        **PLAINTIFF**

                                        **By Counsel**

_____
H. F. Salsbery, Esq.
Eric B. Snyder, Esq.
Bailey & Glasser, LLP
227 Capitol Street
Charleston, WV  25301
(304) 345-6555
(304) 342-1110 facsimile
*Admitted Pro Hac Vice*

Leslie Ann Caldwell, Esq. (ASB-6726-L70L)
Lusk, Lusk, Dowdy & Caldwell, P.C.
2100 Highland Avenue, Suite 410
Birmingham, Alabama 35205
(205) 933-7090
(205) 933-7099 facsimile

250480

# ALABAMA
**Center for Health Statistics**

# ALABAMA
### CERTIFICATE OF DEATH

 EXHIBIT 2

06-16147

101

FN

| DECEASED-NAME First | Middle | Last | DATE OF DEATH | COUNTY OF DEATH |
|---|---|---|---|---|
| Ruby Frances | | Showe SUMMERLIN | March 25, 2006 | Jefferson |

CITY, TOWN, OR LOCATION OF DEATH AND ZIP CODE: Birmingham 35209

HOURS: 2:25   PLACE OF DEATH: Brookwood Medical Center

INPATIENT: Inpatient   No   RACE: White   SEX: Female

AGE: 75   DATE OF BIRTH: September 30, 1930   SOCIAL SECURITY NUMBER: 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

MARITAL STATUS: Married   SURVIVING SPOUSE: Melvin E. Summerlin, Sr

STATE OF BIRTH: Alabama   RESIDENCE-STATE: Alabama   COUNTY: Dallas   CITY: Jones 36749

STREET AND NUMBER: 201 County Road 829   INFORMANT: Melvin E. Summerlin, 201 County Road 829, Jones, AL 36749

USUAL OCCUPATION: Packaging   KIND OF BUSINESS: Meat Company

FATHER-NAME: Freeman G. Showe   MAIDEN NAME OF MOTHER: Ethel M. Rowe

CEMETERY: New Live Oak Cemetery   LOCATION: Selma, AL

FUNERAL HOME: Lawrence Brown Service Funeral Home P.O. Box 554, Selma, AL 36702-0554

DATE SIGNED: May 17, 2006

DATE: 5/15/2006   Russell Rousso

REGISTRAR: Sherry L. Myers   LICENSE NUMBER: 35385   DATE FILED: May 18, 2006

3/25/06 2258   2018 Blvd Dr. Bham AL 35209

### MEDICAL CERTIFICATION

PART I. IMMEDIATE CAUSE: Myocardial Infarction   APPROXIMATE INTERVAL: 15 min

PART II. Other significant conditions: Coronary Artery Disease

MANNER OF DEATH: Natural Cause

AUTOPSY: No

DATE OF INJURY

HOW INJURY OCCURRED

INJURY AT WORK: No

This is a legal record and must be filed within five (5) days after death.

MAY 22 2006

I, Dorothy S. Harshbarger, State Registrar of Health Statistics, certify this is a true and exact copy of the original certificate filed in the Center for Health Statistics, State of Alabama, Department of Public Health, Montgomery, Alabama, and have caused the official seal of the Center for Health Statistics to be affixed. 2006-269-693-2

Dorothy S. Harshbarger, State Registrar

June 2, 2006

Summerlin, Frances S   SSN: 422 38 6770

RUSSELL RONSON, M.D.

Page 1

IN THE UNITED STATES CIRCUIT COURT

FOR THE SOUTHERN DISTRICT OF ALABAMA

NORTHERN DIVISION

MELVIN E. SUMMERLIN, as Executor    )

of the Estate of FRANCES SUMMERLIN,  )

deceased,                      )

       Plaintiff,         )

vs.                      )CV NUMBER:

BAYER CORPORATION, BAYER HEALTHCARE,  )28-cv-00251

LLC, BAYER HEALTHCARE PHARMACEUTICALS,)

INC., BAYER HEALTHCARE AG,        )

       Defendants.        )

DEPOSITION OF RUSSELL RONSON, MD

3:30 p.m.

MAY 11, 2009

BY: Susan Bell, CCR#14, Notary Public